## M & I Auction Company v. City of Philadelphia et al.

*J. M. Gray,* for plaintiff.

*A. T. Ashton,* City Solicitor, and *J. F. Ryan,* Assistant City Solicitor, for defendants.

MARTIN, P. J., July 18, 1929.—A bill in equity was filed by plaintiffs, averring that they are citizens and taxpayers and registered with the Secretary of the Commonwealth of Pennsylvania and the Prothonotary of the Courts of Common Pleas of Philadelphia County to trade under the fictitious name of the "M & I Auction Company;" that Thomas F. Watson, Director of the Department of Supplies of the City of Philadelphia, advertised for sealed proposals to supply 300 horses to be used by the City; that in answer to the advertisement and in accordance with the specifications and information for bidders, bids were filed with the Director, and, among others, a bid by plaintiffs, who also filed a certified check for $2500, which was more than 5 per cent. of their bid; that the bids were duly opened by the chief clerk of the Director and publicly announced; that the M & I Auction Company's bid for each horse was $159, amounting to $47,700; that Paul Connelly's bid was $173, amounting to $51,900, and the bid of J. L. Roach $181, amounting to

$54,300; that plaintiffs were the lowest bidders; that Albert Milikovsky called at the office of the Director to discuss the matter and the Director refused to interview him; that a letter was sent by counsel for plaintiffs to the Director, calling attention to the ability, qualifications and responsibility of plaintiffs and their willingness to comply with all further requirements with regard to entering a bond for the faithful performance of the contract if awarded to them, and notifying the Director that, in the event the contract was not awarded to them, proceedings would be instituted; that the Director awarded the contract to Paul Connelly instead of plaintiffs, and that the price bid by Connelly was $4200 more than the bid of plaintiffs; that plaintiffs have had experience in the purchase, selling and dealing in all kinds and classes of horses and mules for twenty-eight years last past; that within the last eleven years plaintiffs have conducted an auction business for the sale of horses and mules in the City of Philadelphia; that they were the lowest responsible bidders, well and fully qualified to perform the contract; that the Director is guilty of an abuse of discretion in not awarding the contract to plaintiffs and in awarding it to Paul Connelly at a price higher than the bid of plaintiffs; that the Director knew that plaintiffs were the lowest responsible bidders on the contract, and with full knowledge and disregard of the laws and statutes pertaining thereto refused to award the contract to plaintiffs, the lowest responsible bidders.

The bill contains prayers for a preliminary injunction to restrain the execution of a contract to any person except plaintiffs.

An answer was filed by defendants, averring that the Director refused to interview the plaintiffs because the bids had been opened and the contract not yet awarded, and he did not desire to permit any representations or statements made to him other than those contained in the bids. It is admitted in the answer that the Director received a letter from the counsel for plaintiffs, but denied that the statements set forth in the letter are entirely true. It is averred that the business and experience of the plaintiffs was largely in buying, selling or dealing in horses which were not of first quality, and not such as are required by the City under the bids submitted in this case; and that investigation convinced the Director that plaintiffs are not the lowest responsible bidders; that they are not practiced, experienced nor accustomed to dealing in horses of the type required by the City; that their general business is dealing in horses of a grade and type not desired by the City, and that their general business reputation is not such as to qualify them as the lowest responsible bidders for this contract. The answer denies that the Director was guilty of an abuse of discretion in not awarding the contract to plaintiffs, and avers that he acted in the exercise of a sound discretion vested in him under the City Charter and law relating to the awards of city contracts; and that in awarding the contract to Paul Connelly he complied with the law in awarding the contract to the lowest responsible bidder.

A rule was granted to show cause why a preliminary injunction should not issue. Testimony was taken in support of the rule, which, after hearing, was discharged. It was agreed by counsel for the parties that the evidence taken upon the application for a preliminary injunction should be treated as the evidence on a final hearing.

### Discussion.

Plaintiffs admitted that they had never bid upon a City contract, but offered proof of their financial ability and testified that the horses to fulfill the contract could be obtained by them within the time specified; that they had half

a dozen men to spot horses in the West, and they would look them over and pay for them; that they have supplied leading firms in Philadelphia, the Newton Coal Company, Abbotts Dairies, Harbison's Dairies and various trucking companies.

Witnesses were called on behalf of defendants to prove that the Director of the Department of Supplies was justified in refusing to accept the bid presented by plaintiffs and in awarding the contract to the higher bidder, who was known to be thoroughly responsible.

The chief clerk of the Department of Supplies testified that in a conversation with one of the plaintiffs he was told that plaintiffs' bid was made instead of and for Roach.

It was testified that on a previous occasion Roach had been the lowest bidder and that a contract was awarded to him, but there were continual rejections, and out of the total lot ordered only one-half were actually delivered because there were so many rejections, and that the business was finally wound up without getting a sufficient number of horses. This alleged conversation with the plaintiff was reported to the Director before the bids were opened.

Plaintiffs denied that there had been such a conversation, but there was no evidence that the denial was known by the Director.

There was testimony that Connelly has been in the business of buying, selling and shipping horses for thirty years; that during the war he sold 16,000 horses in one year to the French Government, and that at the present time he sells 6000 or 7000 horses a year; that he has had four contracts with the City of Philadelphia; and at the time the City took over street cleaning he sold the City 800 horses, at another time 300 horses, another time 400 horses and on still another occasion 100 horses; that his reputation was A-1 among all horsemen, that he handled the best class of draft horses that came to this market, and was the only man that handled first class draft horses in the Philadelphia market.

It was testified by a former city veterinarian that he had known the M & I Auction Company for years; that they handled auction horses, possibly a third or fourth grade horse, and that is their reputation as to the class of horses they handle; that any horse that goes to auction is a third or fourth class horse; that not many first class horses were sold at auction, but they were sold privately, and the auction handles what is left. This witness testified that he bought second-hand horses from Milikovsky for a contract at Hog Island and for a contract at Hammonton, New Jersey, third grade horses to be used in excavation work; that he had been dealing with Milikovsky for twenty-five years; that they handle what are called "plugs," a low-grade horse, a cheap kind of horse, not the kind of horse to be supplied to the City on the contract now under consideration.

He further testified that he had sold some horses to them that brought on an average between $90 and $100, but not one of them would be passed on a City contract; that he sold a pair of horses for them for the price of $425 which were represented as sound, but proved unsound and were rejected.

Albert Milikovsky testified that they bought horses where they could; there were plenty of firms giving up their business of hauling with horses and using trucks. He admitted that they never handled a contract for 300 horses since the war, but had a contract for 150 horses and got the horses from all over the country—out West or right in the city; the only bid they had made for business with the City was to sell the City's rejected horses.

Mr. Watson, the Director of the Department of Supplies, testified that he visited the stable of plaintiffs and made inquiry by correspondence out West and an investigation of his own, which proved to his satisfaction that the plaintiffs were not in a position to give the City of Philadelphia first class service for 300 horses; that he knew Connelly could fill the contract, as he had done on other occasions, while the Milikovskys had not previously had a City contract. He sent inspectors to get information, and their statements convinced him that the plaintiffs were not qualified. He visited their place and saw no horses of the calibre required, and there were no people around the stable of the class that wanted horses of that kind.

Connelly testified that he had sold second-hand horses for Milikovskys, but no horse purchased from them by him ever went to the City.

Schneider, a veterinarian practicing in the neighborhood of plaintiffs' stable, testified that their stable never was in very good shape; was not a clean stable; not kept up to the mark; not a sanitary place, or anything like it; he stated he had examined some horses that came from there and that they were not of A-1 type; and that their reputation as to the kind of horses they sell is of a low type.

Tisman, a veterinarian in charge of the City Stables at Fairhill Street and Girard Avenue, and Drake, a City veterinarian, testified to the reputation of plaintiffs, which was that they did not deal in first class heavy horses, but a second grade horse.

Duddy, stable manager for Abbotts' Dairies, testified that he works a thousand horses bought from Connelly; and that he bought one horse, a year ago, from plaintiffs which was a second-rate horse, not a good horse; that plaintiffs' place was very untidy, not a proper place to keep a young horse; a makeshift stable, not kept tidy or clean, and did not have proper room in the stalls or ventilation; and there was no comparison with Connelly's stable, where there was plenty of ventilation and room for the horses to move around; that plaintiffs sometimes had as many as four and five horses in one stall.

Smith, who buys horses for Ringling Brothers, testified that he has bought a lot of good horses from Connelly in the last ten years; that Connelly supplies good horses and his reputation is the best of any active dealer in Philadelphia.

Eastlack, a horse dealer of Gloucester, testified that when he wants the best type of horse he goes to Connelly, and when he wants a second, third or fourth class horse he goes to plaintiffs.

Wilgus, who is in the lumber business and a dealer in horses, testified that he buys horses from Connelly and that he never had any trouble with a horse bought from him; that he has bought horses from plaintiffs not of the type purchased from Connelly; that plaintiffs sell second-hand horses; that they bought used-up horses from him; and that he had bought a few horses from plaintiffs for which he paid from $40 to $75 and one horse $135.

Thorn, a farmer who deals in horses at Runnemede, testified that he has done business with Connelly for twenty years, and has bought horses from plaintiffs "to my sorrow—got them down home and had the expense of taking them down and the expense of bringing them back;" that the horses looked good, but "fell down" on him; and that was the kind of horse they handled.

Stanley, a horse dealer in Westville, testified that he sold plaintiffs rejected horses, and had not been paid for the last batch; that on account of a pair of horses sold about October, there is a lawsuit with them over a check on which payment was stopped.

494

Waters, who is in the coal business, testified that he buys horses from Connelly, and during thirty-five or forty years he has bought thousands of horses from him of the very best; that Connelly's reputation as to the kind of horse he deals in is of the best; but the reputation of plaintiffs is not so good, and he has had a lot of trouble with them; their general reputation is that they handle second-hand horses, cheap horses; his trouble was caused by misrepresentation of horses; that he bought two horses from plaintiffs, hitched them up the next morning and one backed out and dropped over dead.

Bender, a horse salesman employed by plaintiffs to sell their horses, testified that he sold very few, because the horses were misrepresented by plaintiffs. That they gave him several horses to take out and directed him to represent them to be good working horses; he sold one to the Eureka people for $175; they kept the horse for a couple of days, he broke a wagon and nobody would buy him; that the witness showed him to several people and was told he ought to be ashamed of himself with a horse like that. He testified that he never saw a first class horse in plaintiffs' stable; that they did not handle first class horses, to his knowledge, and that he had discussed it with lots of other people, and he knows every horse dealer in Philadelphia and has been in the horse business fifteen years and around plaintiffs' stable ten years.

## Findings of fact.

1. Thomas F. Watson, Director of the Department of Supplies, advertised for sealed proposals to supply 300 horses to be used by the City of Philadelphia.

2. In answer to the advertisement, a bid was made by the M & I Auction Company to supply the horses for $159 each, or a total sum of $47,700; and a bid by Paul Connelly of $173, making a total of $51,900.

3. The contract was awarded by the Director to Paul Connelly.

4. Paul Connelly has been a satisfactory bidder for supplying horses to the City of Philadelphia on previous occasions. Plaintiffs never had a contract to provide horses to the City of Philadelphia.

5. Before awarding the contract, the Director made careful inquiry as to the reputation of plaintiffs and their ability to fulfill the contract and was convinced plaintiffs were not the lowest responsible bidders, but that Connelly was the lowest responsible bidder. In the exercise of the discretion vested in him as Director of the Department of Supplies of the City of Philadelphia, he awarded the contract to Connelly.

## Conclusions of law.

1. Defendant, Thomas F. Watson, Director of the Department of Supplies, has not abused his discretion in awarding the contract to Paul Connelly.

2. Plaintiffs are not entitled to an injunction restraining the execution of the contract to Paul Connelly.

3. Plaintiffs are not entitled to have the contract awarded to them.

4. The bill should be dismissed.

5. Plaintiffs to pay the costs.

Of the twenty-five requests for findings of fact presented on behalf of plaintiffs, the 1st, 2nd, 3rd, 4th, 5th, 6th, 7th, 8th, 9th, 10th, 11th, 12th, 13th, 16th, 23rd and 24th are affirmed.

The 14th, 15th, 17th, 18th, 19th, 20th. 21st, 22nd and 25th requests for findings of fact are refused.

Of the eleven requests for conclusions of law presented on behalf of plaintiffs, the 1st and 8th are affirmed; and the 2nd, 3rd, 4th, 5th, 6th, 7th, 9th, 10th and 11th are refused.

The eight requests for findings of fact and the three requests for conclusions of law presented on behalf of defendants are affirmed.

It is ordered, adjudged and decreed as follows:

1. That the bill in equity filed in this case is dismissed.

2. That the plaintiffs pay the costs.

3. The prothonotary is directed to give notice to the parties or their counsel of record of the filing of this decree *nisi.*